UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X

| | | |
|---|---|---|
| LILLIAN KRISTIANSEN, | : | Civ No.: 1:22-cv-05601 |
| | : | |
| Plaintiff, | : | |
| | : | |
| -against- | : | **JURY TRIAL** |
| | : | **DEMANDED** |
| METROPOLITAN TRANSIT AUTHORITY, | : | |
| NEW YORK CITY TRANSIT AUTHORITY, | : | |
| and TRANSIT WORKERS UNION, LOCAL 100, | : | |
| | : | |
| Defendants. | : | |

-----------------------------------------------------------------------X

## COMPLAINT

Lillian Kristiansen ("Kristiansen" or "Plaintiff"), for her Complaint, herein states as follows:

1.      Plaintiff is a former employee of Defendant Metropolitan Transit Authority ("MTA") and a former member of Defendant Transport Workers Union, Local 100 ("Local 100"). At the time of her resignation from Defendant MTA in or about January 2022, Defendant Local 100 was prosecuting a grievance on Plaintiff's behalf for out-of-title work that Plaintiff had been performing since 2018.

2.      After a belated, summary, and unsupported rejection of Plaintiff's grievance by Plaintiff's *de facto* supervisor Richard Watson on or about January 7, 2022, Defendant Local 100 abandoned the grievance, over Plaintiff's objections, on or about January 21, 2022. Because Plaintiff's grievance was well-founded, Defendant Local 100 was, and is, obligated to prosecute it to conclusion consistent with the implied duty of fair representation it owes Plaintiff. Plaintiff is entitled to relief under Section 301 of the National Labor Relations Act ("NLRA") and other statutes as described below.

## THE PARTIES

3.      Plaintiff Lillian Kristiansen is, and was at the time of her employment by Defendant MTA, a skilled HR professional, she was never an executive or management-level employee of MTA. For approximately two years, Plaintiff was an unrepresented member of MTA staff before she became a member of the Local 100 union in or about June 2017. She remained a Local 100 member until her resignation in January 2022.

4.      Defendant Metropolitan Transit Authority is a public benefits corporation and the largest transportation network in North America, servicing New York City and the surrounding areas, with headquarters in New York, New York.

5.      Defendant New York City Transit is a part of the MTA and is responsible for operating subway and bus service in New York City.

6.       Defendant Transport Workers Union, Local 100 is a New York local chapter of the Transport Workers Union of America which represents over 41,000 employees of the New York City public transportation system.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff alleges a violation of her rights under Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185.

8.      This Court has personal jurisdiction over Defendants all of which are incorporated in the State of New York or do business comprehensively in New York or both.

9.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) & (2) and 29 U.S.C. § 185(a).

## FACTUAL BACKGROUND

10.     Plaintiff applied for an HR role with Defendant MTA as a Staff Analyst in or about October 2014.

11.     Plaintiff began her employment with Defendant NYCT in the Enterprise Asset Management Department as IT Change Management Staff Analyst, an unrepresented position, on or about February 23, 2015. For over a year, Plaintiff worked in Human Resources Change Management projects but under the auspices of the Enterprise Asset Management Department.

**Plaintiff is Transferred in 2016, is Promoted to Associate Staff Analyst in 2017 and Becomes Represented by Defendant Local 100 Shortly Thereafter**

12.     Defendant MTA restructured the Enterprise Asset Management Department in or about April 2016. As a result Plaintiff was transferred to the HR-Employment Engagement & Workforce Relations Department ("the EWR Department") under Vice President Patricia Lodge ("Lodge"). Plaintiff kept working on the same IT-based projects but now in the EWR Department. As part of the restructuring, the plan was for employee recognition and employee engagement, including employee suggestion programs and exit interviews, to be centered at the EWR Department, to help with employee retention.

13.     Plaintiff received a two-step promotion to Associate Staff Analyst on or about July 1, 2017. Following the promotion, Plaintiff reported to Assistant Vice President Arthur Mahler ("Mahler") and Director Ronald Liburd ("Liburd"). Shortly thereafter, on or about August 31, 2017, Plaintiff and similarly situated unrepresented staff in the EWR Department became members of Defendant Local 100.

**From 2018 to 2022 Plaintiff Performed Out-of-Title Work**

14.     By about November 2017 Plaintiff was already performing in effectively a management role by acting as the lead for the Performance Management Program, which

3

should have been done by a Associate Vice President- or Director-level employee. While Associate Staff Analyst was the highest non-management title in the EWR Department, the work at that position is designed to be ancillary to, and in support of, responsible management-level personnel. Associate Staff Analysts are responsible for executing tasks at the immediate direction of managers, not running their own projects or supervising other employees or interns. Notwithstanding that, Plaintiff found herself doing all of those things.

15.     Over the next four years, Plaintiff's performance of out-of-title, management-level work was reflected not only in her responsibilities, but also in the titles she was given, and, starting in or about 2021, explicit recognition by Defendant MTA on organizational charts and in Plaintiff's HR records that she was, in fact, a member of management. Defendant MTA, however, never gave Plaintiff the compensation or benefits that Plaintiff was entitled to, or the support or adequate resources Plaintiff needed to complete the tasks she was assigned.

16.     This out-of-title work was principally in connection with four assignments, each of which is described below.

a.   *As Lead HR Liaison For Performance Management Project*

17.     In or about 2018, Plaintiff was designated the Lead HR Liaison for the HR Department to partner with Talent Management and Organizational Design Performance Management Program, with the changes in duties coming in or about late 2017 but no change to title as an Associate Staff Analyst. This role required Plaintiff to perform out-of-title work, including coaching managers and coordinating with other departments to maintain the accuracy of data.

b.   *Co-Managing Employee Suggestion Program*

18.     In or about 2018, Plaintiff was tasked with further out-of-title work while working on the Employee Suggestion Program, including updating the President's SharePoint

site, sending daily updates to Deb Prato ("Prato"), the Senior Vice President of People and Business Transformation leading Executive Steering Committee meetings, and partnering with her previous department to develop technical requirements for the program database. This was a management level position as evidenced by the following: The project charter had originally assigned Associate Vice President Mahler to these responsibilities, only for Plaintiff to take over all the responsibilities for the project, reporting directly to Prato. Jessica Kavoulakis, Plaintiff's predecessor in managing Employee Suggestion in the Employee Engagement & Workforce Relations Unit of Defendant NYCT, was a Manager in title. To the same end, Plaintiff's counterpart, Lisa Vernon, who then and now manages the Employee Suggestion Program for Long Island Railroad, is also a Manager in title.

c. <em>As De Facto Manager on the EPSLA Project</em>

19.     On or about April 1, 2020, while working from home due to the pandemic, Plaintiff was designated as a Human Resources contact for Defendant NYCT, which encompassed approximately 50,000 employees, for the Federal Emergency Paid Sick Leave Act ("EPSLA Project"), along with Associate Vice President Mahler and Director Liburd in a Memorandum from Paul Fama ("Fama"), Chief of People.

20.     Not only was Plaintiff assigned a task along with two manager-level colleagues, Plaintiff's equivalent designee on the parallel Federal Emergency Family Medical Leave Act ("EFMLA Project") was Tania Graham, also a Manager. Plaintiff was given other out-of-title responsibilities, including participating in meetings with MTA Headquarters and Legal and generating reports for the Inspector General, Comptroller, and Department of Labor. Prato designated Plaintiff as the designee with Department of Labor to manage data on project and demonstrate compliance.

21.     On or about May 11, 2020, Plaintiff emailed Mahler and Liburd, copying Lodge, informing them that she was working 12 to 17 hours daily to meet the demands of this role. Plaintiff was responding to hundreds of inquiries from affected NYCT personnel on a weekly basis, as well as reporting to the Comptroller and to the Inspector General's office with information about these leaves, all at the express direction of Prato. In or about June 2020, Nol Joaquin was then loaned to Plaintiff as project support. Plaintiff was responsible for training and directing Nol Joaquin's activities until on or about April 1, 2021. For this project, Plaintiff also had "trackers" persons who drafted reports that she reviewed, collated data from, and generated reports from – this included Nol, and later Charyn Levy, Sharon Rodriguez, and Andrea Ali, all of whom effectively reported to Plaintiff in connection with the project. At least two of these "trackers", Levy and Ali, were themselves managers.

22.     On or about December 10, 2020, Plaintiff sent an email to Liburd, copying Lodge and Kim Moore-Ward ("Ward"), Deputy Chief People and Labor Relations Officer, outlining her concerns with her out-of-title work, and requesting her title be reconciled with her duties by promoting her to Manager. (Exhibit A). Plaintiff met with Lodge and Ward on or about January 19, 2021 and was informed that no Promotions in Place were possible, and in order to be promoted to Manager, she would need to apply for one of the Manager positions as they became vacant.

          d.   *As "Manager, Employee (Learning & Engagement) Community NYCT, B&T, C&D"*

23.     On or about April 29, 2021, Plaintiff, along with many others, was notified by Memorandum from Fama that as part of a mandate from the Governor and State Legislature, Defendant MTA was undergoing a Transformation, which included an upcoming "Lift and

Shift" which would transition existing staff into "newly formed functional departments at MTA Headquarters". (Exhibit B, p. 4).

24.    On or about June 25, 2021 (letter dated June 24, 2021 but sent the following day), Plaintiff received a letter from Patrick Smith, Deputy Chief of People for HQ, indicating that, effective June 28, 2021, Plaintiff would be assigned to Defendant MTA's People Department; that the "reassignment does not affect [her] compensation, benefits, or work hours"; that her "current working title remains unchanged"; and that her "new reporting supervisor will be Yvell Stanford". During a Teams meeting held on or about June 28, 2021 with Deputy Chief, Organizational Design and Development, Yvell Stanford and other employees of her Tower, an Organizational Chart was screen-shared that labeled Plaintiff as "*Manager*, Employee (Learning & Engagement) Community NYCT, B&T, C&D" (emphasis added), reporting to Director of Employee Engagement and Retention, Richard Watson ("Watson"). (Exhibit C). Plaintiff also found that in the My MTA Portal ("PeopleSoft"), there was an entry that stated that Plaintiff's role was "*Mgr Position* Chg/No Salary Chg".  (Exhibit D) (emphasis added).

25.    Plaintiff met with Deputy Chief People Officer for Development and Policy, Rhonda Hogan-Brock ("Brock"), on or about July 15, 2021, questioning her assignment to this role as a non-management level person receiving salary and benefits as an Associate Staff Analyst. Plaintiff followed up this meeting by email on or about July 15, 2021 to Fama copying Brock requesting "commensurate compensation" to match her "title bump to a Manager position". (Exhibit E).

26.    Defendant MTA never took any action to address this issue and Plaintiff remained in this position until she resigned in or about January 2022.

**After Months of Delay, Defendant Local 100 Files a Grievance on Plaintiff's Behalf Only to Immediately Abandon It in the Face of Opposition by Management**

27.     On or about August 24, 2021, Plaintiff contacted Denise Wellington ("Wellington"), her Union Representative from Defendant Local 100. Wellington indicated that she believed Plaintiff had grounds to file a grievance. Wellington stated that she would compose a draft for Plaintiff's approval, and put it on the docket prior to an upcoming September 12, 2021 Union event in Las Vegas, which would prioritize Plaintiff's complaint. Wellington encouraged Plaintiff to consider seeking an Associate Budget Chief position as a remedy, rather than a Manager position, which would be a promotion that would come with a salary increase, but would allow Plaintiff to maintain represented status within the Union. Plaintiff stated that she wanted the promotion as well as back pay and benefits recognizing the years of out-of-title work she had performed.

28.     Wellington failed to put the grievance forward or provide Plaintiff with a draft by Wellington's own self-imposed September 12, 2021 deadline, but continued to have multiple conversations with Plaintiff about her grievance. Around this time, Plaintiff's PeopleSoft status reverted back to Associate Staff Analyst, but Yvell Stanford's organizational charts and communications still reflected Plaintiff's operating title as a manager.

29.     On or about September 13, 2021, Plaintiff, along with other employees, was asked to report back to work in person on a hybrid schedule.

30.     On or about October 24, 2021, Wellington sent Plaintiff an email attaching the first draft of the Contract Interpretation Grievance Form ("the Form"). On or about October 27, 2021, Plaintiff responded to an email from Wellington, and attached a revised draft of the Form with additional details. After not receiving a response from Wellington, Plaintiff replied again on or about November 1, 2021, asking if Wellington had a chance to review her draft.

On or about November 7, 2021, Wellington texted Plaintiff indicating that Wellington "didn't forget about the grievance" and was "having intermittent internet as the computer shut down … several times." Plaintiff responded via email the next day and expressed "concern[] about the impact of these delays on statutes of limitations on my grievance." Wellington then sent an email outlining some additional changes Plaintiff made to the Form, requesting additional information from Plaintiff, and stated that "[a] copy of the grievance has been sent to the Union Director for his approval." Plaintiff responded that same day providing the additional information that was requested. Plaintiff followed up by email on or about November 10, 2021 asking if Wellington had heard anything and pointed out two errors she noticed in the most recent draft of the Form.

31.     On or about November 12, 2021 Plaintiff and other employees were asked to report back to work in person on a full-time basis.

32.     Wellington responded to Plaintiff on or about November 18, 2021, indicating that the two errors were corrected and attached a new draft of the Form. On or about December 1, 2021, Wellington sent an email to Plaintiff asking her to sign the attached version of the Form. Wellington informed Plaintiff that it would be submitted to Watson in his capacity as her Manager. Around this time, Plaintiff requested Paid Time Off for the period of December 23, 2021 to January 4, 2022, which was granted.

33.     On or about January 6, 2022, Watson, in his capacity as Plaintiff's Manager, denied her grievance. He found that Defendant Local 100 had cited to an inapplicable provision of the Collective Bargaining Agreement; summarily declared that Plaintiff's out-of-title work was included in her role as Associate Staff Analyst; and stated that Plaintiff's claim was time-barred. (Exhibit F). On or about January 10, 2022, Wellington forwarded to Plaintiff the reponse from Watson and that same day Plaintiff replied, asking Wellington to identify the next

steps Defendant Local 100 would take regarding the grievance. (Exhibit G). On or about January 21, 2022, Wellington responded that "[t]he Union can no longer move forward with the grievance. The remedy sought for the grievance is a promotion, since you are no longer an employee and a member, we no longer have standing." (Exhibit H)

34.     It should also be noted, and is now grievable, both that Defendant MTA still has not paid out PTO for Plaintiff, which we calculate to amount to $13,391.50, and that Plaintiff did not receive any General Wage Increase since 2018.

**Defendant Local 100 Is Required to Prosecute Meritorious Grievances**

35.     A union has a duty to fairly represent a member of its collective bargaining unit in their grievance against management. "Section 301 of the [Labor Management Relations Act] governs the employer's duty to honor the collective bargaining agreement, and the duty of fair representation is implied from § 9(a) of the National Labor Relations Act, 29 U.S.C. § 159(a)." *White v. White Rose Food*, 237 F.3d 174, 179 n. 3 (2d Cir. 2001). A union acts arbitrarily in failing to initiate or process a grievance when it "ignores or perfunctorily presses a meritorious claim." *Samuels v. Air Transport Local 504*, 992 F.2d 12, 16 (2d Cir. 1993) (quoting *Vaca v. Sipes*, 386 U.S. 171, 191 (1967)).

36.     It is beyond reasonable argument that Plaintiff had meritorious claims for out-of-title work that she sought to grieve through the collective bargaining agreement's grievance procedure.

37.     Defendant Local 100 did not effectively prosecute Plaintiff's grievance during her employment and then abandoned the grievance after Plaintiff resigned due to the Defendants' continued disregard for her many meritorious grievances.

38.     Nothing in the collective bargaining agreement, the LMRA, or the NLRA deprives the union of "standing" to represent a now-former employee. To the contrary, it is

well-established that a former employee retains their rights to the benefits of the collective bargaining agreement and to fair representation by their union. *Vaca v. Sipes*, 386 U.S. 171, 183 (1967); *see also Patricia v. Delford Indus., Inc.*, 660 F. Supp. 1429, 1431 (S.D.N.Y. 1987). A successful grievance could certainly obtain Plaintiff's back pay, unpaid PTO and unpaid General Wage Increases. And if promotion were the remedy, Plaintiff could return to work at MTA easily enough.

**NLRA CLAIM**
**COUNT I**
**Violation of Section 301**

39.     Plaintiff reincorporates the foregoing as if fully written herein.

40.     Defendants MTA and NYCTA are subject to NLRA.

41.     Defendants MTA and NYCTA violated the collective bargaining agreement by forcing a union member to perform management-level tasks.

42.      Defendants MTA and NYCTA damaged Plaintiff by denying her salary and benefits that she would otherwise be entitled to.

**NLRA CLAIM**
**COUNT II**
**Breach of Implied Duty of Fair Representation**

43.     Plaintiff reincorporates the foregoing as if fully written herein.

44.     Defendant Local 100 is subject to NLRA.

45.     Defendant Local 100 violated its duty of fair representation to Plaintiff by delaying the filing of her grievance, by filing an inadequate grievance, and by abandoning and refusing to prosecute her grievance.

46.     By failing to fairly represent Plaintiff, Local 100 caused Plaintiff damages.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgement against

Defendants and provide her with the following relief:

A.  A declaratory Judgment that Defendants violated Plaintiff's rights under NLRA.

B.  Reinstatement and promotion.

C.  An award of nominal damages.

D.  An award of compensatory damages in an amount to be determined at trial.

E.  An award of punitive damages in an amount to be determined at trial.

F.  Reasonable attorneys' fees, costs, and other costs and disbursements in this action.

G.  All and any further relief to which Plaintiff may be entitled.

H.  A trial by jury of all such matters properly tried as such is requested.

Dated: June 30, 2022
New York, New York

Respectfully submitted,

By: */s Andrew St. Laurent*
Andrew St. Laurent
HARRIS ST. LAURENT & WECHSLER LLP
40 Wall Street, 53rd Floor
New York, New York 10005
(212) 397-3370